SEIDNER *v.* DILL.

[No. 20,110. Filed April 30, 1965.]

178

*Nelson G. Grills*, of Indianapolis, for appellant.

*Kitley, Schreckengast & Davis*, of Beech Grove, for appellee.

BIERLY, P. J.—Charles Dill, appellee, brought this action in the Municipal Court of Marion County, Indiana, therein alleging that the defendant-appellant, Harold Seidner, maliciously and intentionally shot and killed plaintiff's dog. Defendant answered in compliance with Rule 1-3, and by filing a second paragraph of affirmative answer alleging:

"That a dog of unknown breed and unknown ownership was roaming over the country, unat-

tended by its master or owner or its owner's agent, and did enter upon the property of the defendant and attacked his fowl, and that in defense of his personal property the defendant did shoot and kill said animal as permitted by the statutes of Indiana."

No reply to defendant's second paragraph of answer was filed by the plaintiff.

Without the calling of a jury this case was tried to the court which made a finding in favor of the plaintiff and rendered judgment thereon for the sum of $600 and costs against the defendant.

Defendant within time filed a motion for a new trial alleging three grounds in support thereof. The court overruled the motion and this appeal followed charging error of the court in the overruling of said new trial motion.

Of the three grounds alleged in his motion for new trial, appellant in his brief argued only the third, to-wit:

"The decision of the court is not sustained by sufficient evidence and is contrary to law."

In his brief appellant assumed the issue in the cause to be:

"May a person kill a dog which is *known* to have chased and worried his fowl and is upon his property unattended by its master or owner or his owner's agent?" (Emphasis supplied),

while the appellee contended the issue raised to be:

"Was the verdict of the trial court sustained by sufficient evidence and in accordance with the law?"

While we might criticize the appellee's use of the word "verdict" as technically being applied to a find-

ing by a jury, and the use of the term "decision" as appropriate to the action by the court nevertheless, our courts have held that the term "verdict" used instead of "decision" in the action of the court is not fatally defective.

We shall set forth, by quoting, the statutes or a part thereof relied upon by appellant in support of his appeal, as follows:

> §16-203 (3707). "Any dog that is known to have killed, maimed, chased or worried any sheep, cattle, horses, swine or other live stock or fowls, unless accompanied by his master or some other person, may be killed by any person, and any person who shall own, keep or harbor any dog, after he knows that such dog has killed or maimed, chased or worried any sheep, cattle, horses, swine, other live stock or fowls shall be fined . . . ." §16-203, Burns' 1964 Replacement (Acts 1897, ch. 119, §8, p. 178).

> §16-204 (3708). "If any dog shall be found *roaming over the country* unattended by his master or owner or his owner's agent, it shall be lawful to kill such dog." §16-204, Burns' 1964 Replacement (Acts 1897, ch. 119, §14, p. 178). (Our emphasis).

Testimony and evidence in this cause was presented in the trial court by five witnesses for the plaintiff and three for the defendant.

Dr. Dill, the plaintiff-appellee, testified that he is a practicing physician living in Indianapolis and that the dog in question was registered in the name of Governor Orbie Ranger, the certificate of registration bearing the number 620810 and the date of January 14, 1961, showing ownership in the name of C. W. Dill, M.D.; and that he purchased the dog from one Alfred Davidson for $300. He further testified that on October 28, 1961 his dog, Ranger, was the winner of third place in the shooting dog stake in the field trial held by Marion County Pointer and Setter Club

in Versailles, Indiana, and that on March 3, 1962, the dog was awarded first place by the same club in a similar showing. Appellee further testified that on the day the dog was killed he and a companion had planned to go deer hunting, but before leaving he looked in on the dog in the pen and suggested to his wife to have the children feed the dogs.

He testified that the dog wore a collar with a tag attached bearing the name of the dog, also the name and telephone number of the owner. Upon returning from the hunt Dr. Dill stated that after being told Ranger had been shot and killed, he examined the dog, noted the wounds and found the dog's mouth free of any feathers or material; that he took the dog to the home of the appellant; that appellant acknowledged shooting the dog but attempted to justify the killing of the dog, charging that the dog had been seen about his home that morning, and that later in the day, on hearing his own dog barking, Seidner left his house and saw two dogs coming north from Hanna Avenue to the Cottingham property, whereupon appellant went into the house, got his gun, walked back to the east side of the fence and shot the dog.

Further, Dr. Dill testified he had not known of Ranger attacking chickens; that the dog had been trained by an expert, Alfred Davidson, not to attack barnyard livestock or fowls; that he had been offered, but refused, $600 for the dog, Ranger. Alfred Davidson testified on behalf of appellee by stating that he sold Ranger to Dr. Dill for the price heretofore stated of $300; that training dogs was a hobby with him and that he had trained Ranger as a pup to become an efficient bird dog and to be afraid of chickens and pay no attention to livestock.

Rita Kemp, a neighbor of appellant Seidner, de-

scribed the topography of the land area and on the morning in question stated she heard a shot, saw a dog crumble and fall, but the dog got up and then she saw the man fire a second shot; that when her husband returned from work and was told by the wife that the dog had been shot, they became so emotionally upset that they were unable to eat supper; that the man who shot the dog was standing near the fence and that the dog was killed on Cottingham's property. Witness further testified she saw the man who shot the dog pick up a rag and then left it, but that the object which he picked up could not have been a chicken.

Charles Kemp, husband of Rita Kemp, testified that after arriving home and being informed that a dog had been shot, he went over and noticed that the dog was Dr. Dill's; that he said to his wife that he thought Seidner had "shot himself into trouble". He testified that he examined the dog, took the collar to the office of Dr. Dill, who was out, but that he left the collar at the office. Kemp further testified that he had hunted in the vacant field owned by Cottingham in company with his brother-in-law, Morton Owens, in 1961, and that Seidner, appellant, called them over to his fence and said that since Kemp was new in the neighborhood, he wanted him to know that if his dog got on appellant's property he would kill it.

Katherine Owens, a neighbor of the Kemps, testified that the Owens and Cottingham real estate joined; that on the day the dog was shot she heard a shot some time between 1:00 and 2:00 o'clock P.M., and upon looking out of her kitchen window, through the Cottingham property, she saw a dog running south after the first shot, and saw Mr. Seidner shoot the dog again when it was on the Cottingham property; that

she had, on one previous occasion, seen Seidner. shoot a dog when it was on the Cottingham property.

Appellant testified in his own behalf, stating that he worked at Indianapolis Drop Forge and a fence had been erected between his property and the Kellum property; that a 47-inch fence divides his property from the Cottingham property and on top of this fence there was a one-strand barbed wire. Seidner further testified that he raises chickens as a hobby; that he has from fifty to sixty chickens; that the blooded roosters are valued at $35 each and the hens at $10 each. In answer to the question: "Directing your attention to November 27, 1962, tell the court what happened", he answered:

"I was out working in my yard and two dogs came through from the Kellum property, they came through the driveway. There were some chickens in the yard and they made a dive for the chickens. The dogs came up and went right after them. The chickens ran home. I ran the dogs out and threw rocks at them for about 800 feet into the thicket. I went back of the house, had my overalls on, My wife called to me and said the dogs are in the chickens again. I told my wife to get my gun. It has a three shot 20 gauge. I went to the basement to get some shells. When I went out the door there were two dogs, one had a chicken in its mouth and was going through the gate about one hundred fifty feet from my house. There was a truck in the driveway and the dogs went toward it. They went in back of the truck and about the time I turned around they came back towards me and headed for the hole in the fence. I shot the black and white dog. He dropped the chicken and fell to the ground. I shot at the other dog and then shot the black and white dog again. They both ran across the Cottingham property went over the fence and across the road. That was all the shells I had and I then went into the house."

Appellant further related his conversation with Dr.

Dill when Dill brought the dog to his place. After seeing the dog appellant acknowledged shooting the dog and related why he had killed it. He stated that in the past he had had chickens killed by dogs and in some cases the Township Trustee had paid for those killed. He also stated that Dr. Dill told him that he would have given $500 had the dog not been shot.

On cross-examination Mr. Seidner gave answers to some questions as follows:

"Q. You say the dogs back of your property, one had a chicken in its mouth?

"A. I saw them running the chickens first and I ran them off.

"Q. When you saw them the first time, how long was it until you saw them the second time?

"A. I guess about five minutes. My wife called me, and said the dogs were at the chickens again."

Mrs. Henrietta Seidner testified she saw the dogs on their property after receiving a telephone call from one Mrs. Martin, whereupon she called her husband and told him she saw a black and white dog with a chicken in its mouth; that she went into the house after her husband said he would shoot the dog. On cross-examination Mrs. Seidner said she saw a dog by the hydrant with a chicken in its mouth but she could not tell the dog's color.

Marcella Martin testified that she lived in the house next to appellant's; that appellant's chickens roamed on her property and that she called Mrs. Seidner when she saw the dogs among appellant's chickens. On cross-examination Mrs. Martin said the chickens flew over the fence into her yard when scared but she never saw a dog catch any of them.

On re-direct examination, Dr. Dill related how he

had hunted with Ranger, and when around chickens the dog would run to him as he had been trained to be afraid of chickens. On re-direct cross examination Dr. Dill testified how he trained the dog to fear chickens and that the dog was punished when he disobeyed his command.

Mrs. Kemp, being called on re-direct examination, stated that she had heard two shots and saw the man firing the second shot and that the dog was on the Cottingham property when that shot was fired.

Appellee, in his complaint, charges appellant maliciously and intentionally shot and killed his dog; hence, to avoid a reversal, it is incumbent upon appellant to establish on the record error by the trial court in its judgment that plaintiff-appellee had proved the charges set forth in the complaint.

At the outset we feel impelled to define the word "know" as used in the first line of §16-203 Burns', *supra*, and likewise, the phrase "roaming" as used in the first line of §16-204 Burns', *supra*. These §§8 and 4 respectively, of ch. 119, were enacted in 1897, which was sixty-eight years ago and at a time when Indiana was predominantly agricultural, which was of major importance in the economy of the state. That was an era when the "sheep killing dog" was feared and accorded no consideration, when the fox, the coon, the opossum, the groundhog and the muskrat were of economic importance to hunters, many of whom kept not only one but sometimes two or three dogs. Due to the peculiar characteristic of sheep as defenseless and non-aggressive animals, an attack by a dog or dogs, in many cases, not only caused the loss and injury to sheep but caused those not killed to fail to maintain proper growth and development.

During the latter half of the past century legislation

and court decisions in the state of Indiana have evidenced the value which has been placed upon dogs over and above their intrinsic value. For your consideration we cite the following cases: *The State* v. *Sumner* (1850), 2 Ind. 377; *Kinsman* v. *The State* (1881), 77 Ind. 132; *Jacquay* v. *Hartzell* (1891), 1 Ind. App. 500, 27 N. E. 1105; *Dinwiddie* v. *The State* (1885), 103 Ind. 101, 2 N. E. 290; *Lowell* v. *Gathright* (1884), 97 Ind. 313.

From the testimony in evidence heretofore summarized, certain facts were undisputed in the case at bar, to-wit: that the dog, Ranger, was a well-trained, registered black and white bird dog, bought by appellee Dr. Dill at a price of $300; that the dog had been trained to fear and be afraid of farm animals, including fowls; that on the day the dog was killed, Ranger and a companion dog escaped from their pen and came unattended near the appellant's premises, and the dog, Ranger, was shot and killed; that Dr. Dill took the dead animal to appellant's home and appellant admitted he had shot and killed the dog; that in the presence of appellant, appellee stated he would have given $500 had appellant not killed the animal; that exhibits were admitted showing Ranger to have been awarded third place and first place in successive field trials. Further, undisputed evidence disclosed that appellant had shot and killed a dog on the Cottingham property on a previous occasion; that one of the plaintiff's witnesses testified that when he and his brother-in-law had at one time hunted on the Cottingham property, appellant had called them to the line fence and stated that he would shoot any dog or dogs crossing the line fence to his property; that appellant was a chicken fancier, breeding a special kind of game fowls; some of them were White Muffs, some Dennis Mahoneys and some Hoey Muffs; that the roosters, which

he valued at $35 each, were kept in the pens but that the hens, valued at $10 each, roamed about the premises and occasionally did fly across the fence, thereby being occasionally on the property of others; and that there was no evidence of feathers or blood observed in the mouth of the dog upon examination.

The evidence was conflicting relative to the circumstances under which the killing of the dog occurred. Chief among these was the question as to whose property the dog was on when killed. Evidence was in conflict as to whether the dog was seen with a chicken or a rag in its mouth.

We note in the recital of his testimony that when the dogs first came to his premises, Seidner threw stones at the dogs and drove them 800 feet into the thicket; that within five minutes thereafter his wife called him and stated that the dogs were back again, whereupon he went into the house, loaded his gun and came out and fired the shots that he testified scared the dogs away.

It appears that the appellant must have been confused in his testimony when he said that at the time he first saw the dogs he hurled stones after them and drove them 800 feet into the thicket; that within *five minutes* thereafter his wife called and stated that the dogs were back again, whereupon appellant fired three shots and killed the white and black dog.

Evidence strongly indicates that the dog was shot and died on a neighbor's property; that two shots were fired at the dog, each taking effect; that the examination of the dog's mouth disclosed no evidence of feathers or blood. Further, the record before the trial court shows that appellee's dog was not known as a dog "to have killed, maimed, chased or worried any sheep, cattle, horses, swine or other livestock or

fowls; of any person including fowls owned by appellant"; that the dog had been carefully trained to avoid and fear chickens.

Appellant cites *Walker* v. *Towle* (1901), 156 Ind. 639, 59 N. E. 20, as the sole Indiana case considered under the statutes relied on in support of his defense to the suit for damages brought against him. We are somewhat perplexed as to the applicability of this case to purge the appellant from any wrong-doing in the killing of Ranger. In this case of Walker, *supra,* we witness the passing of an ordinance by the Common Council of the City of Hammond, Indiana, motivated by an emergency arising from a hydrophobia situation. This ordinance, in part, provided:

> ". . . that whenever the mayor of said city may apprehend that there is danger of the existence or spread of hydrophobia within or near said city, he shall issue a proclamation ordering and requiring all persons owning, possessing, or harboring, or having the care of any animal of the dog kind within the limits of said city, either to confine or muzzle such animal for a term not less than thirty nor more than ninety days ensuing the date of such proclamation. . . .",

and the ordinance provided that in any violation of said ordinance the Marshal, policeman or any person may kill any dog running at large not properly muzzled. This ordinance invoked the police power of the City to protect the life and health of the community. Under this ordinance the Town Marshal killed plaintiff's dog. Plaintiff obtained judgment in the trial court upon a verdict by a jury against the defendant. On appeal the Supreme Court reversed the judgment of the trial court, stating that the Town Marshal was justified in killing the dog as provided by the ordinance.

Appellee cites the case of *Springer* v. *State* (1946), 224 Ind. 241, 66 N. E. 2d 529, in support of his contentions and says that the issues therein were strikingly similar to the issues before this court in the case at bar. In that case of Springer, *supra*, the statutes were relied upon as a defense to a criminal prosecution for malicious trespass resulting in the killing of a dog under facts that are similar to the facts in the case at bar. In the Springer, *supra*, case appellant stated he was within his rights to kill a dog alleged to have crippled and killed some of his chickens; that the dog should be considered as a "roaming" dog and be subject to the penalty of the "roaming dog" statute. Judge O'Malley succinctly set forth the facts in that case as follows:

"The killing of the dog by appellant was admitted. The circumstances under which it happened were in dispute. The defendant claimed the dog with another was caught in the act of eating one of his chickens; that the defendant then went into his home, secured his gun and shot the dog and that it then ran away from his property. However, there was evidence that the dog was shot while on the property of a neighbor; that it did not run after the shooting; that an examination of the mouth of the dog disclosed no evidence of blood, meat or feathers; and that if it had been eating a chicken as claimed by the defendant below, traces of the chicken would have been present in its mouth."

On affirming the conviction of appellant in that case, the learned Judge said:

"... There was some substantial evidence from which the court could have found that the killing was not done as claimed by the defendant; that it was wrongful, intentional, and without just cause or excuse. There likewise was sufficient evidence from which the court could have inferred that the dog had not crippled or killed any

of the chickens of the appellant. There was no evidence that the dog was vicious or roaming."

We are of the opinion that the case of Springer. *supra*, is controlling in the case at bar.

In the drafting of the two sections of the statutes quoted heretofore, the legislature did not define the words "known" or "roaming". Thus we may summarize that Webster's defines "know" or "known" as: to perceive, to apprehend as true, to recognize as valid or a fact on the basis of information possessed or of one's understanding or intelligence to possess a mental attitude in regard to, together with the clear comprehension of, a matter or thing, to have knowledge, to have a clear and certain perception and to possess wisdom, and to become cognizant. The word "known", as used in the statute, §16-203, Burns', *supra*, must be characterized as possessing deep significance; that the legislature which passed this statute did not use the word lightly but clothed it, as it appears to us, with a meaning requiring well-considered insight and judgment upon the part of the individual in its application to a specific circumstance or situation.

We do not think that appellant gave due consideration to the meaning of the word "known" as used in the statute but that his act was wholly inconsistent with and in variance from the norms of a community in the time and under the circumstances of the commission of his act.

It appears to us that the court could readily infer that the dog, Ranger, was not vicious, not known to have attacked stock or fowl, nor possessed of a roaming disposition as a proper interpretation of the statute would determine.

We have, in the case at bar, an admitted killing of the dog, which appellant claimed to be justifiable and

lawful, presented to the court. This presented the factual situation in that the evidence was in conflict, thereby necessitating the weighing of the evidence in the record before the trial court on which the trial court could have and did find that the killing of Ranger by the appellant was a wrongful act and performed without justification. Further, we think that there was sufficient evidence to cause the court to infer that appellee's dog neither crippled, killed, chased or worried any of appellant's fowls.

It is a well-known principle of law that where the evidence is conflicting and the trial court found for the appellee, the Appellate Court, on appeal, may not disturb the decision of the trial court. *Springer, supra; Appelby* v. *State* (1943), 221 Ind. 544, 48 N. E. 2d 646; 49 N. E. 2d 533.

It is the law that on appeal "only the evidence most favorable" to appellee "and all reasonable and lawful inferences that may be drawn therefrom" will be considered by the court. *Badgley* v. *State; Brown* v. *State* (1949), 226 Ind. 665, 82 N. E. 2d 841, and the weight of the evidence and the credibility of the witnesses are for the trial court, not the reviewing court, to determine. *Smith, Executrix* v. *Strock, Executrix* (1945), 115 Ind. App. 518, 60 N. E. 2d 157; *McKee* v. *Mutual Life Ins. Co. of New York* (1943), 222 Ind. 10, 51 N. E. 2d 474. It is for the trier of the action to reconcile, reject and accept part of disputed or conflicting testimony. *Snider* v. *Truex* (1943), 222 Ind. 18, 51 N. E. 2d 477.

In view of the fact that the evidence is conflicting and the trial court found against the appellant, it is neither the duty nor privilege of this court to alter a decision thus made by the trier of the facts.

We are of the opinion that in the case at bar the

decision of the court was sustained by sufficient evidence and is not contrary to law. Since no error has been demonstrated by the appellant which necessitates a reversal of the cause, the judgment of the trial court is hereby affirmed.

Judgment affirmed.

Mote, J., concurs;

Hunter, J., concurs in result with concurring opinion, in which Smith, J., concurs.

## CONCURRING OPINION

HUNTER, J. (with SMITH, J.) Concurs in Result Only —We cannot agree with the language employed in the concomitant opinion of Bierly, J. for the reason that the above opinion fails to apply and harmonize the whole body of statutory law applicable to so-called "dog cases" as specifically exemplified by the issues joined and the evidence in the case before us.

The appellant in this appeal affirmatively raised two Indiana statutes as a defense by way of justification for the killing of appellee's dog, Ranger: they are as follows, to-wit; Acts of 1897, ch. 119, §8, p. 178, §16-203 (3707) Burns' 1964 Replacement:

"Any dog that is known to have killed, maimed, chased or worried any sheep, cattle, horses, swine, or other livestock or chickens, unless accompanied by his master or some other person, may be killed by any person, and any person who shall own, keep or harbor any dog, after he knows that said dog has killed or maimed, chased, or worried any sheep, cattle, horses, swine, other livestock or chickens shall be fined. . ."

and

§16-204 (3708). "If any dog shall be found roaming over the country unattended by his master or owner

or his owner's agent, it shall be lawful to kill such dog." §16-204, Burns' 1964 Replacement (Acts. 1897, ch. 119, §14, p. 178).

The evidence applicable to the defense raised by Burns' §16-203, *supra*, is in conflict; however there was ample evidence of probative value from which the court could have directly found or upon which reasonable inferences could have been based that said dog neither ". . . killed, maimed, chased or worried . . ." the appellant's chickens, and that said dog was not "known" to have ever done so.

The evidence as it applies to the defense raised by the appellant pursuant to the terms of Burns' §16-204, *supra*, is uncontradicted and the facts thereunder may be summarized as follows: that the appellee's dog, Ranger, had escaped from the custody of its master; that said dog was killed by the appellant while away from its kennel and while the dog was either on appellant's property or upon the neighboring Cottingham property; that the dog was "unattended"; that the appellant shot the dog; and that said dog was intrinsically valuable.

It appears to us that the evidentiary facts as stated in the two preceding paragraphs are the ultimate and salient determinants applicable to §§16-203 and 16-204, *supra*, respectively.

It further appears to us that in order to apply the statutory law as well as the case law to the facts and issues in the case at bar, we must also take cognizance of the fact that the Indiana General Assembly has recognized since 1923 that a dog is personal property and subject to taxation. Acts of 1923, ch. 74, §§1 and 2, p. 243, Burns' 1964 Replacement (Part 1) §§16-301 and 16-302. The two statutes raised by way of defense in justification for the killing of the dog, Ranger,

Burns' §§16-203 and 16-204, *supra*, quoted above were enacted in 1897 and thus for sixty-eight (68) years they have remained unchanged. We have no case law construing the application of the said two sections to a factual problem as developed in the case at bar. In other words, we have no case law in Indiana defining the meaning of "roaming over the country . . . unattended" and we should define the import of such words and properly relate them to the case before us. It appears to us that this duty is evaded in the above concomitant opinion and as a court it behooves us to attempt to set up some guidelines and common sense rules as they apply to the issues and facts in the case at bar and similar cases. Therefore, the determination herein must rely upon familiar rules of statutory construction and should be related in logical relevance to the conditions and problems of our time.

It is a fundamental rule in the construction of statutes should be construed in a manner to ascertain and give effect to the intention of the General Assembly expressed in the statute. See 26 I.L.E., Statutes, §113 and cases cited thereunder.

It is further a fundamental rule of statutory construction, as determined by the courts of this state, that the intention of the General Assembly must be determined primarily from the *language used in the statute*, and such language must be reasonably and fairly interpreted so as to give it efficient operation, and to give effect, if possible, to the expressed intention of the General Assembly. See 26 I.L.E., Statutes, §113 and cases cited thereunder. It is also basic that

". . . surrounding circumstances and situations occurring after the enactment of the statute *may be of great or even conclusive assistance in determining a meaning which was intended to be conveyed.* Legislative standards are generally couched

in terms which have considerable breadth. *There-fore a statute may be interpreted to include* circumstances or *situations which were* unknown or *did not exist at the time of the statute. Contemporaneous and practical construction may shed valuable light upon statutory meaning . . ."*

It is further basic that

" . . . And so it is a general rule of statutory construction that *a statute,* expressed in general terms and words of present or future tense, *will be applied, not only to situations existing and known at the time of the enactment, but also prospectively to things and conditions that come into existence thereafter . . ."* 2 Horack, *Sutherland Statutory Construction,* 3rd Edition, pp. 508-509. (my emphasis)

Applying these general principles of statutory contruction to the statutes quoted above, the question to be determined is just what the General Assembly intended by the use of the phrase "roaming over the country . . . unattended". The statute itself does not attempt to specifically define such phrase and, because of the lack of a specific definition, it becomes necessary to *judicially* determine from the language of the statute just what the General Assembly intended in the usage of the phrase "roaming over the country . . . . unattended".

In a determination of this legislative intent, we are permitted to examine the apparent reasons which give rise to such legislation and why the General Assembly deemed it necessary to enact it. At the time the statutes were enacted in 1897 the economy of the state was largely agrarian. It was a state of many farms of small acreage. On these farms the owners raised livestock, including sheep. The farms were not usually fenced and there was nothing to protect the stock from marauding dogs traveling in packs. We think it

can reasonably be said that the real intent of the two statutes was to give to the owners of livestock raised on these small farms some protection from dogs trespassing on their land. In other words, these two statutes gave to the owner of livestock the right to kill any dog found trespassing on his land if unattended by its master or owner and to kill any trespassing dog which was known to have killed, maimed, chased or worried any livestock unaccompanied by its master.

Ample justification for the enactment of Burns' §16-203, *supra*, may be found the expression of the nature of the dog in the case of *Wilson* v. *Wilmington & M. R. Co.* (1856), 10 Rich. Law 52 in which case the court alluded to the dog as an animal whose nature is carnivorous, and who is prompted by instinct or appetite to roam at large in the forest in pursuit of game, or upon a sheep-killing expedition; and finally stigmatized him as a yelping cur. (cited as support in *Patton* v. *State* (1894), 93 Ga. 111, 19 S. E. 734.)

It further seems to us that Burns' §16-203 and 16-204, *supra*, are implementive of each other and that we should so construe them. Such a construction is a logical interpretation of said statutes and gives relevant weight to their application as a remedy of protection for farmers engaged in the raising of livestock and fowl for market purposes. Such interpretation should be limited to the obvious reasons for their enactment as practical and logical implementary statutes.

The economy of Indiana has changed from one largely agrarian to one that is largely industrial. The small farms are rapidly disappearing. Livestock raised on the larger farms are being carefully protected by adequate fencing. Today, there are very few dogs that are turned loose by their owners or masters to "roam over the country".

Upon a review of the record in this appeal we are aware of no reason why such a rule of logical implementation is not necessary as a matter of statutory interpretation as it applies to the facts and issues of the case at bar.

We are however, seriously disturbed by the omission in the concomitant opinion, of the applications of well established rules of statutory construction. We should recognize rules of guidance which lead us to an expression that all of the statutes protective of the property right of *all* our citizens must be accorded full weight and consideration in their application. This is not only an imperative necessity—but indeed a duty that we as a court should not evade. Therefore it is our duty as a court to apply such rules.

> . . . "Unless every statute relating to the same subject is taken to constitute collectively one system, or construed as constituting one general statute or law, a uniform system would be impossible, and hopeless inconsistencies would exist, and it would be impossible for one to know what the law was under a given set of circumstances. . . .
>
> We must presume that the legislature passes each and every statute with a knowlege of existing law. If such a presumption could not be indulged in, it would be difficult, if not utterly impossible, to justify the resort to previous legislation. Moreover, it would be impossible without such a presumption to maintain a harmonious system of law, which is so essential to a workable and equitable system of jurisprudence. . ." Crawford, *Statutory Construction*, §232, pp. 435-436.

We are of the opinion that we should adapt the doctrine of *para materia* logically and with specific and pertinent relevancy to the matter at bar, and in such a case relate the doctrine to the obvious intent of the legislature as it relates to a *part of* the *whole* general

statutory *body of the law.* Such a position recognizes the general rule that enactments relating to the same general subject matter are a part of one legislative policy and that all together they constitute one harmonious and uniform system of statutory law and should be construed to the end that each may be afforded complete consideration to the establishment of the rights sought to be protected as an integral part of the *whole body of* the general statutory *law* dealing with the same general subject. Therefore it appears logical that this court should construe that all statutes dealing with one general subject matter (i.e., persons' rights that are expressive of classified property rights in animals) are complementary of each other and should be accorded equal weight as related to the specific object or intent of each and this is particularly true where such specifically accorded weight and construction will not conflict with the general intent of the body of law as it deals with all facets of the general subject matter.

Prior to §§16-203 and 16-204, *supra,* our case law established the rule of the intrinsic value of a dog. This rule was later supported by the 1923 statutes which declare dogs to be personal property and making them subject to taxation. Acts of 1923, ch. 75, §§1 and 2, p. 243 being Burns' §§16-301 and 16-302.

Our Indiana courts have recognized that one may be prosecuted for the killing of a dog under the malicious trespass statute and a conviction and fine has been upheld in such a case by our Supreme Court in the case of *Springer* v. *State* (1946), 224 Ind. 241, 66 N. E. 2d 529. Upon a close examination of that case, it appears that prosecution for malicious trespass under Burns' 1942 Replacement §10-4509, Acts of 1905, ch. 169, §407, p. 584; 1949, ch. 24, §1, p. 43 is a recognition of a property right that exists in the ownership

of a dog and lends credence to the statutory enactments of our Indiana General Assembly which are declarative of the rule that a dog is personal property. It should further be noted in that case the rule is upheld that all the state need prove in order to obtain a conviction is proof that the killing was done *maliciously* or *mischievously* in the language of the criminal statute. A study of *Springer v. State, supra,* reveals therein that there was *no evidence* that the dog was vicious or roaming". It then appears to be abundantly clear that one may not be justified in the killing of a dog *without proof of more* than the cold, hard language of the statute §16-204, *supra,* i.e., when a dog is found "... roaming ... unattended".

We judicially know that in addition to their intrinsic value that dogs, as pets and as companions to the elderly and the blind, may have an extrinsic value of far more worth to their owners than their intrinsic value. In this regard, we agree with the above opinion. The nature of such extrinsic value is evidenced by the following quotations:

"... Lo, the poor Indian! whose untutored mind Sees God in clouds, or hears him in the wind;
...

To be content his natural desire; He asks no Angel's wings, No seraph's fire; *But thinks, admitted to that equal sky, His faithful dog shall bear him company."* Epistle 1, Alexander Pope's, *Essay on Man.* (my emphasis)

In the case of *State v. Harriman* (1884), 75 Me. 562, 46 Am. Rep. 423, in a dissenting opinion where the question presented was whether a dog was a domestic animal Appleton, C. J., used the following language:

"He is a domestic animal. From the time of the Pyramids to the present day, from the frozen pole to the torrid zone, wherever man has been, there

has been his dog. Cuvier has asserted that the dog was, perhaps, necessary for the establishment of civil society, and that a little reflection will convince us that barbarous nations owe much of their civilization above the brute to the possession of the dog. He is the friend and companion of his master, accompanying him in his walks; his servant, aiding him in his hunting; the playmate of his children; and inmate of his house, protecting it against all assailants."

And later on the Chief Justice quoted approvingly the following poetic tribute to dogs:

"They are honest creatures,
And ne'er betray their masters, never fawn
On any they love not."

Senator Vest made a closing argument to the jury in a suit between two citizens of the State of Missouri in a damage suit for $222 brought by one citizen against another who had killed his dog. In his remarks to the jury, Senator Vest made no reference to the law, the evidence, or the merits of the case but confined his remarks to a remarkable tribute to the dog which is as follows:

"The best human friend a man has in the world may turn against him and become his enemy. His son or daughter that he has reared with loving care may prove ungrateful. Those who are nearest and dearest to us, those whom we trust with our happiness and our good name may become traitors to their faith. The money that a man has he may lose. It flies away from him, perhaps, when he needs it most. A man's reputation may be sacrificed in a moment of ill-considered action. The people who are prone to fall on their knees to do us honor when success is with us may be the first to throw the stone of malice when failure settles its cloud upon our heads. The one absolutely unselfish friend that a man can have in this selfish world, the one that never deceives him, the one that never proves ungrateful and treacherous, is his dog.

A man's dog stands by him in prosperity and in poverty, in health and in sickness. He will sleep on the cold ground where the wintry wind blows and the snow drifts fiercely, if only he may be near his master's side. He will kiss the hand that has no food to offer. He will lick the wounds and sores that come in encounter with the roughness of the world. He guards the sleep of his pauper master. as if he were a prince. When all other friends desert he remains. When riches take wings and reputation falls to pieces, he is as constant in his love as the sun in its journeys through the heavens. If fortune drives the master forth an outcast in the world, friendless and homeless, the faithful dog asks no higher privilege than that of accompanying, to guard against danger, to fight against his enemies, and when the last scene of all comes, and when death takes the master in its embrace and his body is laid away in the cold ground, no matter if all other friends pursue their way, there by the graveside may the noble dog be found, his head between his paws, his eyes sad but open in alert watchfulness, faithful and true even in death." 2 Classics of the Bar, p. 240.*

We therefore emphatically state that the indiscriminate killing of a dog, *without proof of more* cannot be justified especially when such a dog is a child's or a household pet or the companion of an elderly person or a seeing-eye dog of a blind person, which dog regularly has a place of abode and is regularly fed by a master and is often temporarily beyond the control of, or who momentarily escapes or eludes the custody of, its natural master and after a short absence will customarily return to the place of abode or custody of its master. We hold that neither should a dog, when in the pursuance of natural animal instincts, and is not vicious, or committing

---

*The jury returned a verdict in favor of the plaintiff. It is said that, although the suit was for only $200, the verdict of the jury was for $500, and that some of the jurors wanted to hang the defendant.

acts of injury, or a nuisance and is not a public health menace be considered "roaming" within the purview of Burns' §16-204, *supra*.

In other words, a dog should not be judicially declared to be the object of target practice merely upon the whim of a person who would justify its killing simply on the grounds that it was outside the custody of, or momentarily and temporarily beyond the immediate recall command, of its master *without proof of more* than the strict hard language of the statute Burns' §16-204, *supra*.

For the foregoing reasons we are of the opinion that the judgment of the trial court should be affirmed.

Judgment affirmed.

' Smith, J. concurs in the above opinion as it applies to the merits.

Smith, J.

In addition to the immediate foregoing opinion of Hunter, J. in which I concur, I would further concur in an affirmance for the reason that the appellant has failed to meet the strict requirements of Supreme Court Rule 2-17 in the preparation of his brief in that he has failed to set out with specificity an assignment of errors therein.

NOTE.—Reported in 206 N. E. 2d 636.